# United States Court of Appeals
## For the First Circuit

No. 13-2166

ROBERT RILEY,

Plaintiff, Appellant,

v.

METROPOLITAN LIFE INSURANCE COMPANY, d/b/a METLIFE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Lipez, Circuit Judge.

Valeriano Diviacchi for appellant.
James F. Kavanaugh, Jr., with whom Johanna L. Matloff and Conn
Kavanaugh Rosenthal Peisch & Ford, LLP were on brief, for appellee.

March 4, 2014

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LYNCH, <u>Chief Judge</u>.** In 2012, plaintiff Robert Riley filed suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 <u>et seq.</u>, against defendant Metropolitan Life Insurance Co. ("MetLife"), arguing that MetLife had been underpaying his monthly benefits since its 2005 denial of his assertion that he was entitled to a larger payment calculation under his long-term disability insurance plan. The district court granted MetLife's motion for summary judgment on the grounds that Riley's suit was barred by the six-year statute of limitations. <u>See</u> <u>Riley</u> v. <u>Metro. Life Ins. Co.</u>, ___ F. Supp. 2d ___, 2013 WL 5009618 (D. Mass. Sept. 11, 2013). We affirm, rejecting Riley's argument that this long-term disability plan must be analogized to an installment payment plan so as to alter the accrual date of his claim. In doing so, we join three other circuits. We also reject his claim that the plan documents here create a different accrual rule for him based on a principle of "symmetry" and reject his equitable arguments.

## I.

The relevant facts of this case are undisputed. Riley began working at MetLife in 1988. By 1999, Riley had been promoted to associate general manager and earned approximately $80,000 per year. In February 2000, however, Riley began experiencing chronic back, neck, knee, and shoulder pain, which also led to a bout of depression. Riley left work and received short-term disability

(STD) benefits from February 2000 through July 2000. His claim for continued benefits beyond July 2000 was denied.

In the spring of 2001, Riley returned to MetLife, this time in a non-managerial role in which he earned much less than he had previously as a manager. In May 2002, however, Riley's pain returned, and he left work again. Riley received STD benefits until November 2002. He then made a claim for long-term disability (LTD) benefits. Riley's claim for LTD benefits was approved in March 2005.

The MetLife LTD plan ("the Plan") is governed by ERISA and explicitly gives MetLife authority in its discretion to interpret the terms of the contract. The plan provided that, if on LTD, Riley would receive half of his pre-disability earnings, offset by any disability payments from Social Security and certain other sources of income. To calculate Riley's benefits, MetLife utilized his non-managerial salary from 2002, before he applied for LTD. Use of that salary gave Riley LTD benefits of $871 per month, which was fully offset by Riley's Social Security benefits to leave a net benefit of $50 per month, the plan minimum. Had MetLife used Riley's managerial salary from 2000 (before his STD leave) as its starting point, Riley would have been entitled to benefits of about $3,000 per month, leaving a net of about $1,400 per month after the Social Security offset. In May 2004, when he submitted forms in support of his claim for LTD benefits, Riley contacted MetLife

through his (since fired) counsel and argued that his sum of each monthly LTD benefit should be based on his managerial salary from 2000, not his lesser salary from 2002. MetLife disagreed.

MetLife issued Riley his first LTD benefits check for $50, which was less than the amount he felt he was owed, on April 15, 2005. Riley refused to cash it. He likewise refused to cash any of the subsequent checks he received, returning them all to MetLife in December 2005. He also called MetLife in December 2005 to request that MetLife stop sending him the benefit checks. Riley had retained counsel and, in October 2005, his counsel threatened MetLife with suit based on MetLife's decision to base the LTD benefits on Riley's 2002 non-managerial salary rather than his 2000 managerial salary.

On February 7, 2007, Riley, still represented by former counsel, filed suit against MetLife in Massachusetts state court, alleging violations of Mass. Gen. Laws ch. 93A. MetLife removed the case to federal court, which dismissed Riley's claims as preempted by ERISA in November 2007. This court affirmed the dismissal in an unpublished order on October 14, 2009. Riley asserts that his then-lawyers never told him that the suit had been dismissed or that the dismissal was affirmed on appeal.

Early in 2011, Riley expressed concerns to his former lawyers that the statute of limitations period would run on his claim. In response, on March 18, 2011, Riley's counsel filed a

-4-

second suit, this time in federal court. The 2011 complaint did not conform to the district court's Local Rules and was not properly served on MetLife. MetLife moved to dismiss the complaint and Riley's counsel failed to oppose the motion. The district court then dismissed the complaint in January 2012.

Riley retained present counsel, who filed this suit on March 22, 2012. Riley's new complaint presented an ERISA claim for unpaid disability benefits under 29 U.S.C. § 1132(a).[1] The district court allowed limited discovery on the statute of limitations question, after which MetLife moved for summary judgment on the grounds that Riley's suit was untimely. In a thoughtful and thorough opinion, the district court granted MetLife's motion. Riley appeals.

## II.

We review the district court's entry of summary judgment de novo. Fidelity Co-Operative Bank v. Nova Cas. Co., 726 F.3d 31, 36 (1st Cir. 2013). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Id.

ERISA does not provide a statute of limitations with respect to actions to recover unpaid benefits from non-fiduciaries

---

[1] The complaint filed by Riley's present counsel also included claims against Riley's prior counsel for malpractice. The parties settled those claims and stipulated to their dismissal with prejudice.

under its civil enforcement provision, 29 U.S.C. § 1132(a). See Santaliz-Ríos v. Metro. Life Ins. Co., 693 F.3d 57, 59 (1st Cir. 2012). Federal courts "borrow the most closely analogous statute of limitations in the forum state." Id. The most closely analogous statute of limitations here is the six-year period Massachusetts applies to breach of contract claims. See Mass. Gen. Laws ch. 260, § 2.

While state law governs the length of the limitations period, federal common law determines when an ERISA claim accrues. See Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 139 (1st Cir. 2005). Ordinarily, a cause of action for ERISA benefits accrues "when a fiduciary denies a participant benefits." Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 223 (1st Cir. 1996), partially abrogated by Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242 (2010).

Here, MetLife allowed Riley's LTD claim, but with its first check for $50, MetLife denied his explicit assertion that any award of that sum was inaccurate. This was not a complete repudiation or a formal denial of all LTD benefits. But it was a clear repudiation of Riley's assertion that he was entitled to more than the amount MetLife actually awarded. We agree with those circuits which, in like circumstances, have concluded that an ERISA cause of action accrues when, after a claim for benefits is made and a specific sum is sought, the ERISA plan repudiates the claim

or the sum sought, and that rejection is clear and made known to the beneficiary. See, e.g., Miller v. Fortis Benefits Ins. Co., 475 F.3d 516, 520-21 (3d Cir. 2007) ("In the ERISA context, the discovery rule has been 'developed' into the more specific 'clear repudiation' rule whereby a non-fiduciary cause of action accrues when a claim for benefits has been denied. . . . [T]he clear repudiation rule does not require a formal denial to trigger the statute of limitations." (emphasis omitted) (quoting Romero v. Allstate Corp., 404 F.3d 212, 222 (3d Cir. 2005))); Union Pac. R.R. Co. v. Beckham, 138 F.3d 325, 330 (8th Cir. 1998); Daill v. Sheet Metal Workers' Local 73 Pension Fund, 100 F.3d 62, 66 (7th Cir. 1996); see also Novella v. Westchester Cnty., 661 F.3d 128, 147 (2d Cir. 2011) (holding that limitations period begins to run "when there is enough information available to the pensioner to assure that he knows or reasonably should know of the miscalculation," and explaining its view that its standard is consistent with the Third Circuit's reasoning in Miller).

Other provisions of ERISA support this interpretation. In Edes, we applied a discovery rule to suits under § 510 of ERISA, to hold that plaintiffs discovered the supposed miscalculation of their status when they were hired. 417 F.3d at 139. In the context of suits against fiduciaries, ERISA itself establishes that the limitations period runs from "the earliest date on which the

plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2).[2]

There is no dispute that Riley's suit is untimely as to MetLife's initial calculation of Riley's benefits and its first payments. The facts show that Riley argued to MetLife that it should use his managerial salary before he began receiving payments, then saw the $50 amount on his checks, refused to cash them, and threatened to sue MetLife. Together, these facts demonstrate that Riley certainly was aware of his claim for underpayment when he received his first $50 check in April 2005. That was approximately six years and eleven months before he filed this suit and thus falls outside the six-year limitations period. And there has been no recalculation of benefits thereafter.

Riley argues, however, that even though his suit is untimely as to the initial calculation and the first few monthly payments, it is still timely as to all of the monthly payments made within six years of the time he filed his complaint in this case. He argues his ERISA Plan with MetLife is better characterized as an installment contract,[3] giving him a separate cause of action and a

---

[2] Riley has not alleged that MetLife is a fiduciary for purposes of this suit. There is no inconsistency between the statutory rule and our approach to accrual. See Pisciotta v. Teledyne Indus., Inc., 91 F.3d 1326, 1332 (9th Cir. 1996) (per curiam).

[3] Installment contracts are used in different settings. Installment contracts typically involve an asset transfer in the form of a sale of goods. See, e.g., Black's Law Dictionary 372,

new accrual of the limitations period with respect to every individual monthly underpayment. He argues this must be so under a provision in the Plan's terms allowing MetLife to recover overpayments regardless of when they were made and argues that "symmetry" and equity require that he be allowed to recover underpayments, at least for those payments made within the six-year limitations period.[4] We address each of these arguments in turn.

A.

In an issue of first impression in this circuit, we reject Riley's argument that the ERISA plan must be treated as a

---

868 (9th ed. 2009) (referring "installment contract" to "retail installment contract," which involves a "sale of goods"); 15 Williston on Contracts § 45:2 (4th ed. 2013) (observing that installment contracts, "for the sale of goods," are governed by the Uniform Commercial Code); see also Pride Hyundai, Inc. v. Chrysler Fin. Co., 369 F.3d 603, 607 (1st Cir. 2004) (discussing operation of installment contracts, which "allow the customer to pay for an automobile over the course of an extended period of time," in the context of car sales); cf. Berezin v. Regency Sav. Bank, 234 F.3d 68, 73 (1st Cir. 2000) (promissory note requiring monthly principal and interest payments on loan financing purchase of real estate for business venture is an installment contract).

[4] On appeal, Riley has waived any argument that the statute of limitations should be equitably tolled as a result of his original attorneys' malpractice. See DeCaro v. Hasbro, Inc., 580 F.3d 55, 64 (1st Cir. 2009).

continuing violation or as an installment contract,[5] with a new accrual date starting a new limitations period for each payment.

We join the three other circuits which have squarely confronted and rejected the plaintiff's accrual theory in this ERISA context. They have concluded that the plaintiff's theory of accrual is inapplicable where the alleged wrong is based on an alleged one-time miscalculation of ERISA benefits of which the plaintiff is aware.

The Third Circuit rejected the plaintiff's accrual theory in <u>Miller</u>, 475 F.3d at 516. In <u>Miller</u>, the plaintiff had begun receiving allegedly miscalculated disability benefits in 1987 but did not file suit until 2003. The Third Circuit held that the plaintiff's claim had accrued in 1987, and that a suit filed in 2003 was untimely. <u>Id.</u> at 522. The court held that the plaintiff should have been alerted to the fact that he was being underpaid as

---

[5] In his briefing, Riley used the terms "continuing violation" and "installment contract" interchangeably for his argument that a new accrual period began with each benefits check. The district court used the term "installment contract" but equated the two theories. At oral argument and contrary to his briefing, Riley disavowed the "continuing violation" language and to characterize his claim as involving only an installment contract. The difference between the two theories, he says, goes to the number of back payments that can be recovered: in the installment contract theory, only those payments starting six years before he filed suit may be recovered, while in the continuing violation theory, all payments may be recovered as long as the most recent violation was within six years. While we accept his disavowal of any continuing violation theory, we do not engage this debate, and use the terms as alternate expressions for Riley's accrual theory, as he did in his briefing.

soon as he saw the first check.  <u>Id.</u>  It explicitly rejected the theory "whereby a new cause of action would accrue upon each underpayment of benefits owed under the plan." <u>Id.</u> Like the Third Circuit in <u>Miller</u>, we agree that:

> an underpayment can qualify as a repudiation because a plan's determination that a beneficiary receive less than his full benefits is effectively a partial denial of benefits.  Like a denial, an underpayment is adverse to the beneficiary and therefore repudiates his rights under a plan.  <u>Cf.</u> 29 C.F.R. § 2560.503-1(m)(4) (defining "adverse benefit determination" to include "a denial, reduction, or termination of, or a failure to provide or make payment (<u>in whole or in part</u>) for, a benefit" (emphasis added)).

<u>Id.</u> at 521.  We also agree that "repudiation by underpayment should ordinarily be made known to the beneficiary when he first receives his miscalculated benefit award."  <u>Id.</u>

The Third Circuit reasoned that its rejection of the installment contract accrual theory in ERISA cases would promote the traditional aims of statutes of limitations -- "rapid resolution of disputes, repose for defendants, and avoidance of litigation involving lost or distorted evidence," <u>id.</u> at 522 (quoting <u>Romero</u>, 404 F.3d at 223) -- and was "consistent with the broad, beneficiary-protective goals of ERISA," <u>id.</u>

The Second Circuit also rejected plaintiff's ERISA accrual theory, with some glosses on the precise accrual date,[6] in

---

[6]  Those glosses do not require exploration on the facts of this case.  Riley was well aware of his claim for underpayment from

-11-

<u>Novella</u>, 661 F.3d at 128.  There, in considering whether class certification was proper, the court examined when non-fiduciary ERISA claims would accrue.  It considered and rejected the plaintiff's theory, explaining that "that method is appropriate in ERISA cases, as elsewhere, <u>only</u> 'where <u>separate</u> violations of the same type, or character, are repeated over time,'" and that "it is not as clear a fit in cases where, as here, 'the plaintiff['s] claims are based on a single decision that results in lasting negative effects.'"  <u>Id.</u> at 146 (alteration in original) (emphasis added) (quoting <u>L.I. Head Start Child Dev. Servs., Inc.</u> v. <u>Econ. Opportunity Comm'n of Nassau Cnty., Inc.</u>, 558 F. Supp. 2d 378, 400, 401 (E.D.N.Y. 2008)).

The Ninth Circuit rejected a like theory in <u>Pisciotta</u> v. <u>Teledyne Industries, Inc.</u>, 91 F.3d 1326 (9th Cir. 1996) (per curiam).  It concluded that claims accrue under other provisions of ERISA on the "earliest date" on which the plaintiff has knowledge of the breach, and that those same concerns apply to ERISA's civil enforcement provision.  <u>See</u> <u>id.</u> at 1332.

Riley has identified no circuit court cases taking his approach and applying an installment contract accrual theory to ERISA benefit claims.  Instead, Riley argues from dicta in <u>McNamara</u> v. <u>City of Nashua</u>, 629 F.3d 92 (1st Cir. 2011), which speculated that "conceivably if the City had to make periodic payments . . .

_____

the first $50 check he received.

-12-

and successively underpaid [plaintiff], a claim might arise each time a payment was made." Id. at 96. That dicta is just that, and in any event is distinguishable here.

The issue in McNamara was not whether the retirement plan administrator had miscalculated the plaintiff's benefits and continued to issue checks based on that miscalculation. Rather, the complaint in that case alleged that the City of Nashua, the plaintiff's former employer, had reported incorrect information to the New Hampshire Retirement System (NHRS), causing NHRS to pay pension checks that were too low. Id. at 93-94. More than seven years later, the plaintiff sued the city for its alleged misrepresentation of his period of service to NHRS; he did not sue NHRS directly for the monthly underpayments. Id. at 94, 96.

Additionally, the payments at issue in McNamara were governed by a state retirement plan under the laws of New Hampshire. ERISA did not apply, and the case cited in support of this position applied state law. See id. at 96. Finally, McNamara itself went on to note its speculation was "beside the point." Id. Indeed, it then cited a case involving successive underpayments under ERISA, which explained that the installment contract theory "does not apply to a claim based on a single distinct event," such as "the defendants' single alleged miscalculation." Id. (quoting Miele v. Pension Plan of N.Y. State Teamsters Conf. Pension & Ret. Fund, 72 F. Supp. 2d 88, 102 (E.D.N.Y. 1999)).

Riley's entire alleged injury derives from a single action, MetLife's initial calculation of his disability benefits. Riley does not allege that the calculation was actively confirmed at later dates, nor does he allege that there is any provision of ERISA that requires his accrual theory be accepted. Moreover, Riley has not identified any provisions of the Plan documents showing that the Plan should be interpreted as an installment contract.

The policies underlying ERISA support our conclusion. One of ERISA's main purposes is the promotion of "predictability," through which ERISA seeks to "induc[e] employers to offer benefits by assuring a predictable set of liabilities." Conkright v. Frommert, 559 U.S. 506, 517 (2010) (quoting Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 379 (2002)). Allowing beneficiaries to challenge alleged miscalculations on which the statute of limitations has already run by limiting the challenge to recent and future payments would undermine that predictability interest. Cf. Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan, 201 F.3d 44, 49 (2d Cir. 1999) (explaining that allowing a beneficiary to sue long after benefits are calculated by changing the form of the suit "would render the limitation period a limit in name only"). It could also undermine the ERISA plan's reliance on its original calculations and payments for actuarial purposes. Cf. Conkright, 559 U.S. at 517-18 (discussing importance of deferring

to actuarial determinations); <u>Malden Mills Indus., Inc.</u> v. <u>Alman</u>, 971 F.2d 768, 778 (1st Cir. 1992) (emphasizing importance of preserving "actuarial soundness of pension funds" (quoting <u>Chambless</u> v. <u>Masters, Mates & Pilots Pension Plan</u>, 772 F.2d 1032, 1041 (2d Cir. 1985))).

B.

Riley argues that whatever the general rule as to accrual of claims for miscalculation of ERISA benefits, under the provisions of his Plan with MetLife, he must be allowed to challenge the underpayment even after the statute of limitations has expired on the original calculation in order to promote "symmetry." His argument turns on a provision of the Plan documents entitled "Right To Recover Overpayments," which states:

> We have the right to recover from you any amount that we determine to be an Overpayment. You have the obligation to refund to us any such amount. . . .
>
> An Overpayment occurs when we determine that the total amount paid by us on your claim is more than the total of the benefits due under This Plan. This includes any Overpayments resulting from:
> 1.    retroactive awards received from [certain other sources] . . . ;
> 2.    fraud; or
> 3.    any error we make in processing your claim. . . .
>
> We may, at our option, recover the Overpayment by:
> 1.    reducing or offsetting against any future benefits payable to you or your survivors;

-15-

> 2. stopping future benefit payments (including Minimum Benefits) which would otherwise be due under This Plan. Payments may continue when the Overpayment has been recovered; or
>
> 3. demanding an immediate refund of the Overpayment from you.[7]

Riley argues that it is "asymmetrical" to grant MetLife authority to recover overpayments at any time without granting him a corresponding right to so recover underpayments, and that as a result we must infer the existence of that right from the Plan itself and consider his suit timely. We disagree.

ERISA plans, like other contracts, are construed according to their written terms. US Airways, Inc. v. McCutchen, 133 S. Ct. 1537, 1549 (2013). Even if the written terms of the Plan give MetLife a right to recover overpayments by offsetting against future payments or demanding a refund regardless of when the overpayment was first made, they do not establish a reciprocal right for Riley to recover underpayments regardless of when the underpayment was first made (or discovered).[8] Under the familiar principle of expressio unius est exclusio alterius, this was a choice which reflected the intention of the parties. As we have explained:

---

[7] We do not face the question of whether MetLife could recover overpayments through a legal action instituted beyond the statute of limitations.

[8] If the terms of the Plan do not give MetLife such a right, then there is no asymmetry on this point.

> The [*expressio unius*] maxim instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded. . . . While this interpretive maxim is not always dispositive, it carries great weight; and when, as now, there is absolutely nothing in the agreement's text that hints at some additional term lurking beyond the enumerated list, we see no reason why the maxim should not be controlling.

Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) (citation omitted).

Riley argues that we must "liberally constru[e]" the Plan documents in his favor as the beneficiary on an insurance contract. He cites Wickman v. Northwestern National Insurance Co., 908 F.2d 1077 (1st Cir. 1990), for the proposition that "insurance contracts must be liberally construed in favor of a policyholder or beneficiary . . . and strictly construed against the insurer." Id. at 1084 (alteration in original) (quoting 13 Appleman, Insurance Law and Practice § 7401 at 197 (1976)) (internal quotation mark omitted). But Wickman itself goes on to explain, "We are bound by [the policy's] plain language, and we may not distort it in an effort to achieve a desirable or sympathetic result." Id. Because we are bound by the Plan's plain terms, Riley's liberal construction argument cannot save his case.

With nothing in the Plan documents to support his position, Riley turns to equitable arguments, asking us "to do justice" by adding a term to the document allowing Riley to recover

underpayments. We may not alter the Plan documents. ERISA's statutory scheme "is built around reliance on the face of written plan documents." US Airways, 133 S. Ct. at 1548 (quoting Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995)) (internal quotation marks omitted). "The plan, in short, is at the center of ERISA. And precluding [a party's] equitable defenses from overriding plain contract terms helps it to remain there." Id. As the Supreme Court has explained, "[t]he agreement itself becomes the measure of the parties' equities," id.; we "do justice" by enforcing its plain terms.

## III.

Riley's claim against MetLife is barred by the statute of limitations. His remedy for his failure to file a timely ERISA claim lay, if anywhere, against his former attorneys. The decision of the district court is affirmed.